UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :      <u>INDICTMENT</u>

        - v. -                    :      S1 05 Cr. 1115 (WHP)

ULYSSES THOMAS WARE,              :
    a/k/a "Thomas Ware," and
JEREMY JONES,                     :

              Defendant.          :

- - - - - - - - - - - - - - - - -x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 14 2006

<u>COUNT ONE</u>
**(Conspiracy to Commit Securities and Wire Fraud)**

The Grand Jury charges:

**<u>Relevant Persons and Entities</u>**

1.   At all times relevant to this Indictment, ULYSSES THOMAS WARE, a/k/a "Thomas Ware," the defendant, was a resident of Georgia and an attorney licensed in the state of Georgia. WARE ran a purported law firm called Rosenfeld, Goldman & Ware, Inc. (the "Ware Firm") located in Atlanta, Georgia, which also represented itself as an investment bank.

2.   From in or about August 2001 through in or about July 2002, JEREMY JONES, the defendant, was a resident of Georgia who worked for ULYSSES THOMAS WARE, a/k/a "Thomas Ware," the defendant, assisting WARE in finding customers for the legal and investment banking work purportedly provided by the Ware Firm.

3.   At all times relevant to this Indictment, Service Systems International, Ltd. ("Service Systems") was a Canadian corporation with its principal place of business in British

Columbia, Canada.  Service Systems purported to be in the environmental purification business and stock in Service Systems was traded on the Over-the-Counter Bulletin Board[1] under the ticker symbol SVSY.

4.    At all times relevant to this Indictment, Investment Technology, Inc. ("Investment Technology") was a Nevada corporation with its principal place of business in Las Vegas, Nevada.  Investment Technology purported to be in the online gaming business and stock in Investment Technology was traded on the Over-the-Counter Bulletin Board under the ticker symbol INZS.

## THE SCHEME TO DEFRAUD

5.    From in or about 2001 through in or about 2002, ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, engaged in a scheme to artificially inflate the market price of, and market demand for, Service Systems and Investment Technology stock.  Specifically, in order to fraudulently induce investors to purchase Service Systems and Investment Technology stock, WARE and JONES, among other things, caused to be transmitted throughout the United States:

a.    press releases containing materially false and misleading information concerning the business and plans of

---

[1]    The Over-the-Counter, or OTC, Bulletin Board is an electronic quotation service regulated by the NASD that displays real-time quotes, last-sale prices, and volume information for certain securities.

Service Systems and Investment Technology;

b.   press releases with baseless stock price predictions that omitted the compensation WARE was receiving for promoting the stock of Service Systems and Investment Technology; and

c.   press releases containing misrepresentations and omissions concerning the entity issuing the press releases.

6.   After artificially pumping up the price and volume of the Service Systems and Investment Technology stock through use of these fraudulent press releases, WARE then sold, and attempted to sell, stock in Service Systems and Investment Technology at a substantial profit.

### The Service Systems Pump-and-Dump

7.   In or about October 2001, the Ware Firm was retained by Service Systems to provide analyst coverage distributed nationally through press releases, as well as investment banking and fund-raising services, among other services.  For these purported services, Service Systems compensated the Ware Firm with 2,500,000 shares of Service Systems stock, which the Ware Firm was to register on form S-8.

8.   Beginning in or about December 2001, ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, commenced a stock promotion campaign touting Service Systems's stock.  The campaign was in the form of press releases from

various purportedly independent entities, which contained misrepresentations and omissions and were issued for the purpose of fraudulently inducing investors to purchase shares of Service Systems and thereby artificially raise market demand and price for these shares. Among the press releases WARE and JONES issued as part of their scheme to artificially inflate the price and demand of Service Systems's stock were the following:

a.   On or about December 6, 2001, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems; and (2) deceptively purported to be issued by a broker-dealer when, as WARE and JONES well knew, the press release was issued by the Ware Firm.

b.   On or about December 10, 2001, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems; (2) deceptively purported to be issued by a broker-dealer when, as WARE and JONES well knew, the press release was issued by the Ware Firm; and (3) contained a short term price target of $0.45-0.65 when, as WARE and JONES well knew, there was no basis in fact for this price target.

-4-

c.   On or about December 11, 2001, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems; (2) deceptively purported to be issued by an investment advisory firm when, as WARE and JONES well knew, the press release was issued by the Ware Firm; and (3) contained a price target of around $0.60 when, as WARE and JONES well knew, there was no basis in fact for this price target.

d.   On or about December 12, 2001, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems; (2) included inaccurate and misleading information about major capital restructuring for Service Systems when, as WARE and JONES well knew, there was no basis in fact for that information; and (3) deceptively purported to be issued by an investment advisory firm when, as WARE and JONES well knew, the press release was issued by the Ware Firm.

e.   On or about December 17, 2001, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for

-5-

promotional services for Service Systems; (2) included inaccurate and misleading information about funding sources and acquisition candidates when, as WARE and JONES well knew, there was no basis in fact for that information; and (3) which contained a short term price target of $0.45-0.65 when, as WARE and JONES well knew, there was no basis in fact for this price target.

f.   On or about January 10, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems; and (2) deceptively purported to include comments from an analyst concerning Service Systems's business and plans when, as WARE and JONES well knew, the comments were from a co-conspirator not named herein who was employed by the Ware Firm and there was no basis in fact for the comments concerning Service System's business and plans.

g.   On or about January 11, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems; (2) included inaccurate and misleading information about fund-raising and analyst coverage for Service Systems when, as WARE and JONES well knew, the purported analyst coverage was from a co-conspirator not

-6-

named herein who was employed by the Ware Firm and there was no basis in fact for the comments concerning the fund-raising; and (3) contained a price target of $0.77 when, as WARE and JONES well knew, there was no basis in fact for this price target.

h.   On or about January 14, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Service Systems, which, as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Service Systems.

9.   From in or about December 2001 through in or about January 2002, the price and trading volume of Service System's stock increased as a result of the scheme to artificially manipulate the market for Service Systems engaged in by ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants.   In or about 2001, WARE sold some of the Service Systems stock obtained by the Ware Firm, taking advantage of the artificially inflated prices and the artificially inflated volume and receiving illicit profits from these sales.

## The Investment Technology Pump-and-Dump

10.   In or about January 2002, the Ware Firm was retained by Investment Technology to provide analyst coverage distributed nationally through press releases, as well as investment banking, legal, and fund-raising services, among other services.   For these purported services, Investment Technology compensated the

Ware Firm with a total of approximately 7,500,000 shares of Investment Technology stock, which the Ware Firm was to register on form S-8.

11. Beginning in or about January 2002, ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, commenced a stock promotion campaign touting Investment Technology's stock. The campaign was in the form of press releases from various purportedly independent entities, which contained misrepresentations and omissions and were issued for the purpose of fraudulently inducing investors to purchase shares of Investment Technology and thereby artificially raise market demand and price for these shares. Among the press releases WARE and JONES issued as part of their scheme to artificially inflate the price and demand of Investment Technology's stock were the following:

a. On or about January 28, 2002, WARE and JONES were involved in the preparation and issuance of a purported analyst report concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; and (2) provided a "strong buy" investment recommendation when, as WARE and JONES well knew, the recommendation was made for the purpose of generating demand for Investment Technology stock and there was no basis in fact for the recommendation.

b.    On or about February 4, 2002, WARE and JONES were
involved in the preparation and issuance of a press release
concerning Investment Technology, which: (1) as WARE and JONES
well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; and (2) provided
a prediction of 30% annual growth and a two month price target of
around $0.40 when, as WARE and JONES well knew, there was no
basis in fact for this prediction or price target.

c.    On or about February 5, 2002, WARE and JONES were
involved in the preparation and issuance of a press release
concerning Investment Technology, which: (1) as WARE and JONES
well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; (2) provided a
prediction of 30% annual growth and a twelve month price target
of around $1.50-2.00 when, as WARE and JONES well knew, there was
no basis in fact for this prediction or price target; (3)
included inaccurate and misleading information regarding
advertising and promotional efforts by Investment Technology
when, as WARE and JONES well knew, there was no basis in fact for
the information; and (4) deceptively purported to be issued by an
market research firm when, as WARE and JONES well knew, the press
release was issued by the Ware Firm.

d.    On or about February 6, 2002, WARE and JONES were
involved in the preparation and issuance of a press release

concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; and (2) provided a "speculative buy" investment recommendation when, as WARE and JONES well knew, the recommendation was made for the purpose of generating demand for Investment Technology stock and there was no basis in fact for this recommendation.

e.   On or about February 7, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; (2) provided a "strong buy" investment recommendation when, as WARE and JONES well knew, the recommendation was made for the purpose of generating demand for Investment Technology stock and there was no basis in fact for this recommendation; (3) provided an estimate of business activity at Investment Technology related to the company's performance on February 3, 2002, when, as WARE and JONES well knew, there was no basis in fact for this estimate; and (3) deceptively purported to be issued by an investment advisory firm when, as WARE and JONES well knew, the press release was issued by the Ware Firm.

f.   On or about February 8, 2002, WARE and JONES were involved in the preparation and issuance of a press release

concerning Investment Technology, which: (1) as WARE and JONES
well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; (2) included
inaccurate and misleading information regarding a purported
capital financing commitment when, as WARE and JONES well knew,
there was no basis in fact for that information; and (3)
deceptively purported to be issued by Investment Technology when,
as WARE and JONES well knew, the press release was issued by the
Ware Firm.

       g.   On or about February 13, 2002, WARE and JONES were
involved in the preparation and issuance of a press release
concerning Investment Technology, which: (1) as WARE and JONES
well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; (2) provided a
prediction of 30% annual growth and a two month price target of
around $0.50 when, as WARE and JONES well knew, there was no
basis in fact for this prediction or price target; (3) provided
inaccurate and misleading information about a purported letter of
intent to purchase a golf course when, as WARE and JONES well
knew, there was no basis in fact for that information; and (4)
deceptively purported to be issued by an investment advisory firm
when, as WARE and JONES well knew, the press release was issued
by the Ware Firm.

       h.   On or about February 14, 2002, WARE and JONES were

-11-

involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; and (2) included inaccurate and misleading information about international advertising for Investment Technology when, as WARE and JONES well knew, there was no basis in fact for that information.

I.   On or about February 15, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which, as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology.

j.   On or about February 26, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; and (2) included inaccurate and misleading information regarding advertising and promotional efforts by Investment Technology when, as WARE and JONES well knew, there was no basis in fact for that information.

k.   On or about March 18, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for

-12-

promotional services for Investment Technology; and (2) included inaccurate and misleading information regarding the provision of financing for Investment Technology when, as WARE and JONES well knew, there was no basis in fact for that information.

l.   On or about March 25, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; and (2) included inaccurate and misleading information regarding the provision of financing for Investment Technology when, as WARE and JONES well knew, there was no basis in fact for that information.

m.   On or about March 25, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which, as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology.

n.   On or about March 26, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; (2) provided a price target of around $0.22 and a "speculative buy" investment recommendation when, as WARE and JONES well knew, the

-13-

recommendation was made for the purpose of generating demand for Investment Technology stock and there was no basis in fact for this price target or recommendation; (3) included inaccurate and misleading information regarding the intellectual property assets of, and a special stock dividend for, Investment Technology when, as WARE and JONES well knew, there was no basis in fact for that information; and (4) deceptively purported to be issued by an market research firm when, as WARE and JONES well knew, the press release was issued by the Ware Firm.

o.   On or about March 27, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES well knew, omitted the fact that WARE was paid in stock for promotional services for Investment Technology; (2) provided a price target of around $1.50 and a "strong buy" investment recommendation when, as WARE and JONES well knew, there was no basis in fact for this price target or recommendation; and (3) included inaccurate and misleading information regarding the intellectual property assets of, and a special stock dividend for, Investment Technology when, as WARE and JONES well knew, there was no basis in fact for that information.

p.   On or about March 28, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology, which: (1) as WARE and JONES

-14-

well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; and (2) included
inaccurate and misleading information about advertising for
Investment Technology when, as WARE and JONES well knew, there
was no basis in fact for the information.

q.   On or about April 1, 2002, WARE and JONES were
involved in the preparation and issuance of a press release
concerning Investment Technology, which: (1) as WARE and JONES
well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; and (2) included
inaccurate and misleading information about advertising for
Investment Technology when, as WARE and JONES well knew, there
was no basis in fact for the information.

r.   On or about April 3, 2002, WARE and JONES were
involved in the preparation and issuance of a press release
concerning Investment Technology, which: (1) as WARE and JONES
well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; and (2) included
inaccurate and misleading information regarding the intellectual
property assets of Investment Technology when, as WARE and JONES
well knew, there was no basis in fact for that information.

s.   On or about April 9, 2002, WARE and JONES were
involved in the preparation and issuance of a press release
concerning Investment Technology, which: (1) as WARE and JONES

-15-

well knew, omitted the fact that WARE was paid in stock for
promotional services for Investment Technology; and (2) included
misleading information about the internet traffic at the
Investment Technology Web site when, as WARE and JONES well knew,
the traffic had been generated by JONES and a co-conspirator.

12.   From in or about January 2002 through in or about April
2002, the price and trading volume of Investment Technology's
stock increased as a result of the scheme to artificially
manipulate the market for Investment Technology engaged in by
ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the
defendants.   From in or about February 2002 through in or about
April 2002, WARE sold over 7 million shares of the Investment
Technology stock obtained by the Ware Firm, taking advantage of
the artificially inflated prices and the artificially inflated
volume.   WARE sold this stock through a brokerage account held in
the name of a company run by another co-conspirator not named as
a defendant herein and WARE received over $170,000 in illicit
profits.   WARE then transferred these illicit profits from the
sale of the Investment Technology stock to a bank account WARE
opened in the name of the co-conspirator's company and WARE then
took the money for his own personal use.

## STATUTORY ALLEGATIONS

13.   From in or about 2001 through in or about 2002, in the
Southern District of New York and elsewhere, ULYSSES THOMAS WARE,

-16-

a/k/a "Thomas Ware," and JEREMY JONES, the defendants, and others known and unknown, unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with others to commit offenses against the United States, to wit, to commit: (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; (b) securities fraud, in violation of Title 15, United States Code, Sections 77q(b) and 77x; and (c) wire fraud, in violation of Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

14.   It was a part and an object of the conspiracy that ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would

-17-

operate as a fraud and deceit upon a person, in connection with the purchase and sale of securities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

15.   It was further a part and an object of the conspiracy that ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of transportation and communication in interstate commerce and of the mails, would and did publish, give publicity to, and circulate notices, circulars, advertisements, newspapers, articles, letters, investments services, and communications which, though not purporting to offer a security for sale, described such security, namely Service Systems and Investment Technology stock, for consideration received and to be received, directly and indirectly, from an issuer, underwriter, and dealer, without fully disclosing the receipt, whether past and prospective, of such consideration and the amount thereof, all in violation of Title 15, United States Code, Sections 77q(b) and 77x.

16.   It was further a part and an object of the conspiracy that ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, and others known and unknown, unlawfully, wilfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and

property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## MEANS AND METHODS OF THE CONSPIRACY

17.  Among the means and methods by which ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.  As compensation for purported legal, investment banking, and promotional services work, WARE unlawfully obtained freely tradeable Service Systems and Investment Technology securities pursuant to improper S-8 registrations.

b.  WARE and JONES caused press releases containing materially false and misleading information concerning Service Systems to be issued from in or about December 2001 through in or about January 2002.

c.  WARE and JONES caused press releases containing materially false and misleading information concerning Investment Technology to be issued from in or about January 2002 through in or about April 2002.

d.  WARE directed a co-conspirator not named as a

-19-

defendant herein ("CC-1") to talk positively about Investment Technology on the "Raging Bull" investment bulletin board on the Internet, which CC-1 did.

      e.   WARE sold his Investment Technology stock through a brokerage account held in the name of a company run by another co-conspirator not named as a defendant herein ("CC-2").

      f.   WARE transferred the proceeds of the sale of his Investment Technology stock to a bank account WARE opened in the name of CC-2's company and then took the money for his own personal use.

      g.   WARE and JONES used interstate wires in furtherance of their scheme to artificially inflate the market price of and market demand for Service Systems and Investment Technology stock.

## OVERT ACTS

18.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

      a.   On or about January 10, 2002, ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, were involved in the preparation and issuance of a press release concerning Service Systems, which contained material misrepresentations and omissions.

-20-

b.   On or about February 4, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology which contained material misrepresentations and omissions.

c.   On or about February 4, 2002, WARE sold approximately 85,000 shares of Investment Technology, the proceeds of which were wired to a bank account of WARE's.

d.   On or about February 5, 2002, WARE and JONES were involved in the preparation and issuance of a press release concerning Investment Technology which contained material misrepresentations and omissions.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

19.   The allegations contained in paragraphs 1 through 12 and 17 through 18 of this Indictment are repeated and realleged as if fully set forth herein.

20.   From in or about 2001 through in or about 2002, ULYSSES THOMAS WARE, a/k/a "Thomas Ware," and JEREMY JONES, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, in connection with the purchase and sale of securities, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ manipulative and

-21-

deceptive devices and contrivances, in violation of Title 17,
Code of Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and (c)
engaging in transactions, acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon purchasers and sellers of Investment Technology, Inc.
securities.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5;  Title 18,
United States Code, Section 2).

### FORFEITURE ALLEGATIONS

21.  As a result of committing the offenses alleged in
Counts One and Two of this Indictment, ULYSSES THOMAS WARE, a/k/a
"Thomas Ware," and JEREMY JONES, the defendants, shall forfeit to
the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28
U.S.C. § 2461, all property, real and personal, that constitutes
or is derived from proceeds traceable to the commission of the
offenses, including but not limited to, a sum of money equal to
$300,000, representing the amount of proceeds obtained as a

result of the above-listed offenses, for which the defendants are jointly and severally liable.

Substitute Asset Provision

22.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third person;

   c.   has been placed beyond the jurisdiction of the Court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

    (Title 18, United States Code, Section 981;
    Title 28, United States Code, Section 2461.)

Foreperson

MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

ULYSSES THOMAS WARE and JEREMY JONES,

Defendants.

### INDICTMENT

S1 05 Cr. 1115 (WHP)

(Title 15, Sections 78j(b) & 78ff; Title 18,
United States Code, Sections 2 & 371)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

*[handwritten: Dest 11-1-87]*
*[handwritten: 9/14/06]*
*[handwritten: Filed Ind.]*
*[handwritten: Ellis, J]*